UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff,<br>    v.<br>FRANK ANDREW MARCHETTE,<br>    Defendant. | Case No. SACR 19-00165 JLS<br><br>**ORDER DENYING MOTION TO SUPPRESS** |

The Court has reviewed Defendant's Motion to Suppress and the concurrently lodged transcript of the agents' interview of Defendant. (*See* Doc. 52.) The Court has also reviewed the audio of the interview. The matter is fully briefed. (*See* Docs. 57 (Opp.), 58 (Reply).) The matter was heard on December 9, 2022, and the Court held an evidentiary hearing. As set forth herein, and as stated on the record, the Motion to Suppress is DENIED.

## I. BACKGROUND

Defendant is charged with one count of possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B) & (b)(2). (Doc. 1, Indictment.)

On the early morning of July 13, 2015, about 6:26 a.m., FBI agents, together with law enforcement officers of other agencies, executed a search warrant at Defendant's residence, seized digital media suspected of containing images and videos of child pornography, and interviewed Defendant. An FBI agent working the case confirmed the

presence of fifteen armed law enforcement officers.  (Doc. 57-1, Torikai Decl. ¶ 4.)  Prior to the execution of the search warrant, the FBI was aware that Defendant possessed five registered firearms, including four semi-automatic weapons.  (Torikai Dec. ¶ 5.)

Defendant was handcuffed during the team's initial entry into the residence, but he had been uncuffed by the time Agent Torikai began interviewing him.  (Torikai Decl. ¶¶ 11-12.)  The interview began about 6:34 a.m., eight minutes after the team entered the residence.  (Torikai Decl. ¶ 12.)  Torikai recorded the interview, which has been transcribed.[1]  (*See generally* July 13, 2015 Tr.)

As heard on the audio and as appears on the transcript, agents advised both Defendant and his wife that they were free to leave.  (*See id.* at 5 ("Ok well we have a search warrant.  Um you know you guys are free to leave um cause I think you all probably have work . . . to go to?"), *id.* ("Um you can do that.  You're free to leave.  Um, we just ask[] that you don't come back until after we're done . . . so we don't have a lot of people coming in and out of the house.").)  Thereafter, agents questioned Defendant, who admitted to "download[ing] some illegal videos," including child pornography.  (*See id.* at 6-8, 14.)  Forty minutes into the interview, Defendant asks, for the first time, if he "should . . . be looking for an attorney."  (*Id.* at 32.)  Agents told him he was welcome to speak to an attorney, that they could not give legal advice, the decision to consult an attorney was entirely his own decision, and that he was not being charged or arrested at that time.  (*Id.*)

The agents left Defendant's residence with at least one digital device, a laptop computer, less than two hours after they arrived.  (*See* Opp. at 1; Torikai Decl. ¶ 15.)

Defendant moves pursuant to *Miranda v. Arizona* to suppress his statements to the agents.

---

[1] The audio file has been provided to the Court, which has reviewed it in its entirety.  Upon review, the Court notes its agreement with the Government's characterization of Defendant's interview in that Defendant "agreed to speak with the FBI after being told he was free to leave [and h]e was . . . interviewed by two . . . FBI agents in a friendly and open tone."  (Opp. at 1.)

## II.      LEGAL STANDARD

*Miranda v. Arizona*, 384 U.S. 436 (1966), requires that before a custodial interrogation, police must advise a suspect that "he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney[,] one will be appointed for him prior to any questioning." *Id.* at 479.  "Statements obtained in violation of *Miranda* generally are inadmissible in the government's case-in-chief."  *United States v. Gomez*, 725 F.3d 1121, 1125-26 (9th Cir. 2013).  But suspects must be given *Miranda* warnings only before they are questioned while "in custody."  *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam).  Non-custodial interrogations do not require *Miranda* warnings.

Whether an individual is "in custody" is determined by the totality of the circumstances and the inquiry focuses on whether a reasonable person in the circumstances would have believed he could freely walk away from the interrogators.  *Thompson v. Keohane*, 516 U.S. 99, 112 & n.11 (1995).  Generally, factors considered are:

> (1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual.

*United States v. Kim*, 292 F.3d 969, 974 (9th Cir. 2002) (internal quotation marks omitted).  As implied by the language, the inquiry is an objective one, focusing on what a reasonable person would believe, not what a specific individual actually believed.  *Id.* at 973.

As to the specific circumstance of a suspect being interviewed when officers execute a search warrant of his home, the Ninth Circuit has recognized that unique "analytical challenges" are presented.  *See United States v. Craighead*, 539 F.3d 1073, 1082-89 (9th Cir. 2008).  The *Craighead* court observed that "a reasonable person interrogated inside his own home may have a different understanding of whether he is truly free 'to terminate the interrogation' if his home is crawling with law enforcement agents conducting a warrant-approved search."  *Id.* at 1083.  Nevertheless, the court also observed that "courts have

3

generally been much less likely to find that an interrogation in the suspect's home was custodial in nature." *Id.* Consideration must be given to how similar a given at-home interrogation is to an in-custody interrogation at a police station, that is, whether the at-home interrogation is of a suspect held "incommunicado . . . in a police-dominated atmosphere." *Id.* Consideration of a suspect's comfort in and familiarity with his home must be tempered with the degree to which the home has been transformed into a police-dominated atmosphere by the presence of law enforcement officers. *See id.* at 1084. And the *Craighead* court acknowledged that, as always, a determination of whether a suspect is "in custody" during "an in-home interrogation . . . is necessarily fact intensive." *Id.* (internal quotation marks omitted).

The *Craighead* court outlined a number of non-exhaustive factors courts should consider in determining whether an at-home interrogation of an accused is custodial in nature. *Id.* Those factors are:

> (1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made.

*Id.* at 1084.

### III.   DISCUSSION

Defendant was clearly informed that he was not being detained. The relevant question is, therefore, whether the totality of the circumstances establish that, notwithstanding this advisement, a reasonable person would have felt he or she was not actually free to leave. In finding that the interrogation of Defendant was non-custodial, the Court relies heavily on the audio recording. The words chosen by and tone used by the agents did much to counterbalance the police presence in Defendant's home. Just before interviewing Defendant, the agents demonstrated concern with the safety of Defendant's pets and the well-being of his child, further lessening any appearance of coerciveness. The

Court also considers both the general factors identified in *Kim* and the more specific factors identified in *Craighead.*

The Court first addresses the more general factors identified in *Kim*. As to the first factor, Defendant was questioned in a non-coercive manner by two agents who used polite requests rather than commands. The transcript reveals that the agents discussed arrangements for the well-being of Defendant's child and pets before talking to him. (Tr. at 2-5.) The agents advised Defendant and his wife they were free to leave and suggested that they might want to go to work. (Tr. at 5.) After being told this, Defendant answered "[y]eah" to Agent Torikai's question if it was "okay" that the agents "maybe could . . . talk with [him] first." (Tr. at 5.)

As to the second factor, rather than being confronted with evidence of guilt, Defendant was given a copy of the search warrant and questioned about whether he knew the reasons for the search warrant.[2] (Tr. at 5-6.) Fairly quickly, Defendant admitted to viewing child pornography. (Tr. at 8; *see also id.* at 14 (acknowledging that agents would find child pornography files on his laptop computer).)

The third factor, Defendant's physical surroundings are discussed more fully below, in connection with the *Craighead* factors.

As to the fourth factor, the duration of the interrogation, although the agent states that it lasted only 24 minutes (Opp. at 5), the audio file provided to the Court suggests that the entire recorded conversation lasted about an hour. That said, the conversation included issues unrelated to the charged offenses, such as a lengthy conversation about Defendant's firearms, including whether they were registered or not. Even so, assuming the length of the interview was an hour, its length was not coercive.

As to the final factor, the pressure applied to detain Defendant, the tenor of the interview remains voluntary throughout, with the agents, for instance, explaining how they have to seize all devices that contain images of child pornography and discussing how they

---

[2] There is no suggestion in the record that Defendant was presented with any affidavits in support of the issuance of the search warrant. Such an affidavit might constitute confrontation with evidence of guilt.

5

might be able to leave some devices behind, with Defendant's assistance. (Tr. at 17-21.) At the thirty-minute mark, Defendant requested to use the bathroom, and the agents responded that he "[a]bsolutely" could. (Tr. at 22.) Shortly thereafter, agents questioned Defendant about a number of firearms he possessed, made specific reference to a prescription medication they observed for depression, and inquired regarding Defendant's state of mind, causing Defendant to inform the agents that he has "never been suicidal." (Tr. at 33.) Defendant did not state or demonstrate a desire to leave at any time, and the agents' manner of addressing Defendant did not ever suggest that Defendant would not be permitted to leave.

The Court now turns to the more specific *Craighead* factors. As to the first, the Court notes that the number of armed officers—fifteen—executing the search warrant here would generally be expected to create a coercive, police-dominated atmosphere. Although Agent Torikai states it is unlikely that rifles were pointed at Defendant, Defendant testified that, when the officers first approached, some of them pointed their rifles at him. (*See* Marchette Decl. ¶ 3; Torikai Decl. ¶ 9.) On this point, unquestionably, the presence of fifteen armed agents in one's home is objectively intimidating. The same is true of having any number of rifles pointed in one's direction for any period of time. However, the Court notes that this occurred before Defendant was interviewed. When Defendant was questioned, all officers had holstered their guns, and only two agents were present in the room. (Torikai Decl. ¶ 10.)

As to the second factor, Defendant was handcuffed, at least initially, as the search team made their entry and performed a security sweep. (Marchette Decl. ¶ 4; Torikai Decl. ¶ 10.) After about five minutes, and certainly by the time of the agents' interview of Defendant, agents had removed the handcuffs. (Torikai Decl. ¶¶ 10-11.) Being handcuffed, even for a short period of time, is a significant restraint on liberty. Although being unexpectedly handcuffed in front of one's house at 6:30 in the morning is no doubt jarring, the removal of the handcuffs within about five minutes, coupled with the manner in

which the agents communicated with Defendant, tends to ameliorate the coerciveness that otherwise might have lingered.

As to the third factor, Defendant was questioned alone. Agent Torikai contends that this was to protect Defendant's privacy, as his wife may not have known about the reason for the raid. (Torikai Decl. ¶ 13.) Defendant was interviewed in a bedroom adjacent to his home's family room.[3] The was being used for storage of children's items rather than as a bedroom, the door to the room was closed, and Defendant was in the bedroom with Agent Torikai and one other agent. This is at least superficially similar to the situation in *Craighead* in which the defendant was interviewed alone, in a storage room with law enforcement agents. However, Defendant's experience was a far cry from the isolation at issue in *Craighead*, where the suspect was led to a dark "storage room . . . cluttered with boxes" where the FBI admittedly purposely excluded all "non-law enforcement individuals," including the suspect's commanding officer, whom the FBI had brought along for the express purpose of providing "emotional support" for the suspect. *See Craighead*, 539 F.3d at 1078, 1086-87. The *Craighead* court found the location to be highly significant because, in contrast to the storage room, "[a]n interview conducted in a suspect's kitchen, living room, or bedroom might allow the suspect to take comfort in the familiar surroundings of the home and decrease the sensation of being isolated in a police-dominated atmosphere." *Id.* at 1087. Here, the room in which Defendant was interviewed was well-lit, and although used for storage, the items stored were neatly stacked and arranged, and overall the space was more akin to an ordinary, familiar living space that the *Craighead* court viewed as "comfort[ing]" rather than coercive.

The manner in which the agents positioned themselves, a point on which the Court heard testimony, is also suggestive of the Defendant's freedom of movement. The two agents sat next to each other, opposite of and facing Defendant, and did not block the door with their bodies. Defendant sat on a piano bench at a higher elevation than Agent Torikai,

---

[3] A photograph of the room was admitted at the evidentiary hearing. (*See* Doc. 60.)

who testified that she deliberately positioned herself on the low ottoman to a rocker-glider chair (of the type often used by parents in babies' rooms) in order not to appear intimidating. This set up is further suggestive of the fact that Defendant was free to leave.

The final *Craighead* factor weighs strongly against a finding that a reasonable person would have believed he was not free to leave. Even with the number of armed officers and initial handcuffing of Defendant, the subsequent advisement that Defendant was free to leave and the suggestion that he could go to work, in the manner given by Agent Torikai, went far to negate the coercive atmosphere established by the events relevant to the other factors. This will not always be the case, but it was here. Of particular importance, and another fact that distinguishes this case from *Craighead* is that, despite the presence of officers from more than one law enforcement agency, Defendant testified that he understood Agent Torikai to be the agent in charge of the scene. Thus, her verbal advisement that Defendant and his family members were free to leave, coupled with her manner of addressing Defendant, negated any other factor suggesting that Defendant would not be permitted to leave.

In sum, the totality of the circumstances reveal that once officers secured the scene, their conversation and interactions with Defendant were designed to convey that his continued presence and his cooperation with agents were wholly voluntary. The interview reflects a give-and-take between the agents and Defendant regarding his downloading of content (including downloading of child pornography), the likelihood that older digital devices present in the residence had images of child pornography saved on them, and the presence of firearms in Defendant's house. In considering the totality of the circumstances, including both the more general factors and the *Craighead* factors, the Court concludes that Defendant was not in custody when he was questioned by agents. Entry into Defendant's home to execute a search warrant by fifteen armed agents was no doubt alarming to Defendant and his family. This was further exacerbated by the fact that Defendant was placed in handcuffs for at least a short period of time, and had rifles pointed at him at one

point.  Further, Defendant was questioned alone, a factor identified in *Craighead* as particularly indicative of a police-dominated atmosphere.

But Defendant was also expressly advised that he was free to leave, and Agent Torikai specifically suggested he might want to go to work.  When she asked if he would answer some questions, her phrasing is of particular significance:  Would it be "okay" if she "maybe could" ask Defendant some questions.  Thus, judged in its context, Agent's Torikai's statement that Defendant and his wife were free to leave was not a hollow advisement.  The audio reveals that through both words and tone, Agent Torikai took a reserved and measured approach, which was polite to the point of friendliness; she did not make authoritative commands or issue directives.  Although an initial show of force was made in gaining entry and securing the home, this show of force was not continued; rather, confrontation was limited to the initial entry into the home.  Thereafter, agents clearly sought Defendant's cooperation rather than demanding Defendant's compliance via commands.  Agents ensured Defendant's pets were confined and made sure Defendant's child was looked after by the child's mother.  Thus, the Court finds that the totality of the circumstances establishes that a reasonable person would have believed he was free to end the interview and leave at any time.  Because the interview was non-custodial, admission of Defendant's statements in the Government's case-in-chief is not precluded on the basis that Defendant did not receive *Miranda* warnings.

## IV.   CONCLUSION

As set forth herein, the Court denies the Motion to Suppress.

**IT IS SO ORDERED.**

DATED:  December 13, 2022

_____
HON. JOSEPHINE L. STATON
United States District Judge